COMMONWEALTH *vs.* ADOLPH B. BENESCH & others.

SAME *vs.* SAME.

Suffolk.  January 7, 1935. — March 6, 1935.

Present: RUGG, C.J., FIELD, DONAHUE, LUMMUS, & QUA, JJ.

*Larceny. False Pretences. Conspiracy. Evidence,* Competency; *Opinion:* expert. *Practice, Criminal,* Exceptions. *Sale,* Of securities.

At the trial of an indictment for conspiracy to commit larceny by sales to the public of shares in an investment trust by means of false representations that the proceeds of such sales were being used to purchase "underlying" stocks against which the shares sold purported to be issued, a verdict of guilty as to one of the defendants was not warranted where, whatever the capacity in which he was connected with

the trust, there was no evidence that he had anything to do with the purchase of the "underlying" stocks or that he knew, or had access to sources of information from which he could have known, that they were not being purchased as needed to "cover" the shares.

For the same reason, a verdict of guilty was not warranted at such trial with respect to a second defendant, a salesman of the shares in the investment trust, even though there was evidence that he represented to a purchaser thereof that the "underlying" stocks were being purchased.

An inference of guilty knowledge on the part of such salesman was not warranted merely by the circumstance that he worked under the direction of a third defendant who was "general manager and everything" of the trust and who could have been found to have had such knowledge.

At the trial of an indictment for conspiracy, there was no error prejudicial to one of the defendants in the admission of or failure to strike out certain evidence which was competent against him under the rule applicable in conspiracy cases, especially in view of the form in which his exceptions were saved and of the circumstance that such evidence added little or nothing to his own testimony.

At the trial of an indictment, there was no error in the admission of testimony by an expert accountant that a certain balance sheet did not show "a full correct picture" of certain accounts receivable, such opinion having been given only as to whether the balance sheet correctly reflected the contents of the defendant's books, not as to the fairness of the defendant's conduct with respect thereto.

In order to establish the requisite criminal intent on the part of one charged with conspiring with others to commit the offence of selling securities in accordance with an instalment or partial payment contract not approved by the public utilities commission, in violation of G. L. (Ter. Ed.) c. 110A, § 8, which offence is *malum prohibitum* only, it must appear that he had knowledge both of the existence of that statute and of actual or intended violation thereof and therefore knew of the illegal element involved in such sales.

Even if one of several persons charged with conspiracy to commit a crime had a criminal intent, he could not properly be found guilty where none of the others had such an intent; he could not be a conspirator alone.

Two INDICTMENTS, found and returned on June 3, 1932, described in the opinion, against Adolph B. Benesch, Clifton K. Wells, James E. Simpson, James M. Swift, Freeman I. Davison, John M. Robinson, Fred G. Timperley, Ralph K. Hyde, Francis E. Shaw, Adelard Boutin, and Paul R. Tibbetts.

The indictments before verdict were nol prossed as to Swift, Timperley, Boutin, and Shaw. Robinson never was arraigned nor tried. The indictments were tried together

in the Superior Court before *Pinanski*, J., as against Benesch, Wells, Simpson, Davison, Tibbetts, and Hyde. Material evidence is described in the opinion. Verdicts of not guilty were ordered as to Hyde. Wells was found not guilty on the first indictment, but guilty on the second. Benesch, Simpson, Davison, and Tibbetts were found guilty on both indictments.

Under the first indictment, those found guilty were given sentences of imprisonment. The sentence as to Simpson afterwards was revoked and he was placed on probation, waiving his exceptions.

Under the second indictment, fines were imposed. Wells and Simpson paid their fines and waived their exceptions.

A consolidated bill of exceptions saved by Benesch, Davison, and Tibbetts was allowed and brought the cases to this court.

*G. P. Beckford*, for the defendant Davison.

*M. Morton, Jr.*, (*E. R. Hale* with him,) for the defendants Benesch and another.

*D. A. Foley*, Assistant Attorney General, for the Commonwealth.

QUA, J. These two indictments are now before this court on the exceptions of the defendants Benesch, Davison and Tibbetts. The first indictment charges these defendants, together with others as to whom the cases have been disposed of and who are not now before the court, with conspiring to commit the crime of stealing the property of persons unknown. The second indictment charges the same persons with conspiring to have registered brokers or salesmen sell securities in accordance with an instalment or partial payment contract which was not approved by the public utilities commission. G. L. c. 110A, § 8, as amended by St. 1924, c. 487, § 4. Both indictments grow out of the operations of a Massachusetts corporation known as New England Investment Trust, Inc. (name later changed to New England Investors Shares, Inc.), hereinafter called the Trust, during the period from June 1, 1926, to March 1, 1928, at which time the corporation went into the hands of a receiver.

The method by which the business of the Trust was conducted, in so far as it is necessary to state it for the purposes of this decision, was as follows: The Trust sold to the public "collateral trustee shares," so called. With the money obtained from the sales the Trust purchased in the market quantities of certain standard stocks in a large number of different enterprises registered on the exchanges, and deposited these stocks with a designated bank to hold as "underlying shares." On the order of the Trust the bank would issue to each purchaser a certificate of ownership of the number of collateral trustee shares purchased by him. These shares were issued against the stocks purchased and represented the proportionate interest which the purchaser owned in the underlying shares. For convenience the collateral trustee shares and the underlying stocks were divided into "blocks" in such a manner that each block would be worth approximately $10,000, and a single collateral trustee share would sell for about $10, thus representing one thousandth part of a block. The value and the price would vary, however, with the changing market values of the underlying shares. A purchaser could buy as many collateral trustee shares as he wished up to an amount sufficient to represent one or more entire blocks. The Trust sold these shares both for cash and on instalment plans under which the certificate was not to be issued until the price was fully paid. Shares were also sold on the so called collateral deposit plan under which the purchaser continued to owe the purchase price of the shares, but pledged other securities with the Trust as collateral for the obligation. Among the supposed advantages of this form of investment were that it gave the small investor an opportunity to obtain wide diversification and also competent supervision in the selection from time to time of the underlying shares. For the purposes of this decision, the enterprise may be assumed to have been in itself a lawful and proper one. It is obvious, however, that the safety of the purchaser's money depended upon the prompt and faithful performance by the Trust of its duty to purchase the underlying shares, so that the

collateral trustee shares would represent real and substantial value.  The Trust developed into a large business. By the time of the receivership over $10,000,000 worth of collateral trustee shares had been sold.

1. We will deal first with the indictment charging conspiracy to steal.  Under this indictment it is contended by the Commonwealth that during the period in question the Trust to a greater and greater degree as time went on failed to purchase underlying shares in sufficient quantity to "cover" the collateral trustee shares which were being sold on partial payments and on collateral deposits, so that to a large extent these shares came to represent little of value beyond the liability of the Trust to make good its promises, although the Trust continued to assert to prospective purchasers that the underlying shares were being bought; and that the several defendants were in control of or connected with the Trust, knew the facts, and had conspired together to commit larceny by obtaining money from purchasers by means of false pretences.  G. L. c. 266, § 30.  The books showed that by June 30, 1927, the amount necessary to complete the purchase of underlying shares was over $3,000,000.  As to this indictment, the defendant Benesch, who, it appears from his own testimony, was "general manager and everything" of the Trust and as to whom there was plenary evidence of participation in all its activities, does not now argue that there was no evidence to go to the jury against him together with other defendants not now before the court, but he does contend that many errors were committed in admitting and in failing to strike out evidence. The defendants Davison and Tibbetts make the further contention that there was no evidence at all on which they could be held as conspirators.  We deal first with the defendant Davison.

There was evidence against Davison from which it could be found that he was one of the original promoters of the Trust; that a certificate for three thousand nine hundred ninety-seven shares of its capital stock was made out in his name before the date specified in the indictment as the commencement of the conspiracy and was indorsed by him;

that he owned a large interest in and at one time controlled another corporation known as the Discount Company of New England, which "owned" the Trust, through which as broker the Trust made sales of shares and which later was "merged" with the Trust; that he had an office in the office of the Trust and was familiar with the kind of business which it was doing; that his name appeared on the payroll of the Trust from which he drew money at various times aggregating large sums, mostly in cash; that he did "some work" for the executive department; that the Trust paid for his stenographer and for certain hotel bills and his office rent after he moved "down stairs"; that a certificate for one thousand nine hundred nineteen shares of the capital stock of the Trust stood in the name of his stenographer; that in a few instances he was the source of certain sales by the Trust of collateral trustee shares and received commissions on account of those sales; and that he testified before the grand jury to the effect that, having heard from a purchaser of collateral trustee shares that the purchaser had received a dividend from the office of the Trust and not from the bank, he asked Benesch for an explanation, and Benesch said he had temporarily used those certificates and they would be back next week, that Davison asked, "Are you short any more?" and Benesch replied, "Very little" and that they would be back next week, and that Davison thereupon called up the purchaser and said it was the first information he (Davison) had that "They have not everything covered," and that he did not like it. When this occurred does not appear. The competency of some of this evidence is challenged, but because of the conclusions to which we have come it is not now necessary to pass upon its admissibility. Parts of the evidence relating to Davison and some of his own testimony are obscure and unsatisfactory. His contention was, in brief, that about the time when the Trust began business and before the first date mentioned in the indictment he sold out his entire interest in the discount company to or for the benefit of the Trust, that moneys which he received from the Trust and

the use of office room and stenographer were in consideration for the sale of his interest and in accordance with an agreement made at the time of that sale, and that he never in fact owned any of the stock of the Trust or had anything to do with its business or management, and knew nothing of its failure to purchase the underlying securities. Davison never held any office in the Trust. If he was in fact employed by it in some capacity, the nature of his duties does not appear. There is no evidence that he had anything to do with the purchase of underlying shares or that he knew they were not being purchased or that the collateral trustee shares were not kept covered (except for his talk with Benesch stated above, from which it might be inferred that the underlying shares were temporarily short a "Very little," to be replaced "next week") or that he had access to the books or to other sources of information which would have indicated that these shares were not being purchased as needed or that he knew that the Trust continued to make representations that the shares were being purchased when in fact they were not. We have in mind that conspiracies as a rule can be established only by circumstantial evidence. But circumstances must be shown from which a reasonable inference can be drawn that the defendant has participated in the particular conspiracy charged. Whatever inferences might be drawn with reference to Davison's connection with the Trust, there is nothing in the evidence to support a finding that he knowingly and intentionally joined with any others of the alleged conspirators in a conspiracy to steal from purchasers of collateral trustee shares by means of false representations as to the underlying securities. It is as consistent with the evidence that he did not know that any false representations were made to purchasers. If the issue were whether Davison still retained some covert interest in the discount company or in the Trust or was in some manner employed by the Trust, after the time when he claims to have sold out, a very different question would be presented. The defendant Davison's motion for a directed verdict of not guilty should have been allowed. The

case is distinguishable from *Commonwealth* v. *Coshnear*, 289 Mass. 516, in the scope of the evidence and of the inferences which could properly be drawn from it.

There is still less evidence tending to connect Tibbetts with the alleged conspiracy. He was a salesman for the Trust, employed by and reporting directly to Benesch. He sold collateral trustee shares and received in the aggregate over $22,000 as commissions. There was some evidence that he had represented to a purchaser of collateral trustee shares that the underlying shares were being purchased. But he held no office in the Trust, was not responsible for its management and had nothing to do with the purchase of underlying shares. There is no evidence that he knew they were not being purchased or had access to information which should have put him upon notice. So far as appears, he may have been as much deceived as any purchaser. Guilty knowledge on his part cannot be inferred merely because he sold shares under direction of those who could be found to have had such knowledge. His motion for a directed verdict of not guilty should have been allowed.

During the progress of the trial a great many exceptions were taken by the defendant Benesch to the admission of evidence and to the refusal to strike it out at the close of the evidence. The brief for the Commonwealth states that in all several hundred exceptions were taken. We have not counted them, but we have examined all which were saved by Benesch and which have been argued before us. Those cover a large proportion of the evidence recited in this rather voluminous record and a large proportion of the two hundred fifty-two exhibits which were introduced. It would be unprofitable to discuss them in detail. *Commonwealth* v. *Dyer*, 243 Mass. 472, 504. We think there was no error in these rulings which was harmful to the defendant Benesch. The case was tried in the manner in which conspiracy cases are customarily tried, by allowing in the first instance as against each defendant separately evidence of such acts, knowledge and admissions as appear to affect the particular defendant and then, when sufficient evidence has accumu-

lated to support a fair inference of the existence of a conspiracy, by removing the limitation, so that evidence of the acts, knowledge and admissions of all who are found to have joined in the conspiracy, during the course of and in pursuance of the conspiracy, becomes applicable against all the conspirators. *Commonwealth* v. *Riches,* 219 Mass. 433, 438. *Commonwealth* v. *Dyer,* 243 Mass. 472, 507. All this was carefully explained in the judge's charge. By far the greater number of Benesch's exceptions is based upon the contention that the evidence of acts and declarations of others was not "connected up" with Benesch. Nearly all of this evidence had to do with the form of organization adopted by the Trust, forms and prospectuses in use by it, entries in its books of account and in those of the discount company, the manner in which its business was conducted, instructions to and conduct and declarations of its salesmen in soliciting the public and similar matters. As soon as there was evidence tending to show that Benesch was engaged with others in a conspiracy to obtain subscriptions from the public by false representations and that the Trust and the discount company were the instrumentalities being made use of by the conspirators for that purpose, all this became competent. The exhibits dating before June 1, 1926, were competent as bearing upon the condition of the Trust and the method of carrying on its business after that date. It may be that certain of the salesmen went beyond their instructions in some statements made to prospective purchasers, but not in respect to the underlying shares. The exceptions were taken to questions which apparently were or might be made competent and not to the answers of the witnesses wherein such statements appear, and the motion to strike out is in general terms as to the declarations of each witness as a whole. By far the greater part of the evidence to which objection is made was harmless in any event as to Benesch. It adds little or nothing to his own testimony, wherein he admitted the failure to "carry" the underlying shares, and the evidence furnished by the books, which were clearly competent against him. This applies also to the evidence of various conversations with Robinson,

who was indicted with the other defendants, but was not on trial, whether or not the evidence was sufficient to support a finding that Robinson became a fellow conspirator.

There was no error in permitting the witness Cohen, an expert accountant, to testify that a certain balance sheet did not show "a full correct picture" of the customer's accounts receivable. He was giving his opinion not as to the fairness of the defendants' conduct, but only as to whether the balance sheet correctly reflected the contents of the books. This was competent. *Jordan* v. *Osgood,* 109 Mass. 457, 464.

The defendants Benesch and Tibbetts in their brief also seek to avail themselves of an exception which they claim to have saved to the denial by the court of the defendant Davison's request for a directed verdict in his favor. In our opinion it would be a strained construction of the bill to hold that any such exception was saved. We need not consider whether it could possibly have any value in any event.

2. We now come to the second indictment. It is not disputed that the instalment plan contracts had not been approved by the public utilities commission. Under this indictment, in order to hold any one defendant, it was necessary for the Commonwealth to show as to that defendant that he entered into a combination with others for the purpose of doing the illegal act of selling securities on an instalment plan contract which had not been approved by the commission. In the case of conspiracy, as with other common law crimes, it is necessary that criminal intent be shown. Speaking in general terms, there must be an intent to do wrong. Selling the shares on instalments was not in itself wrong. It need involve no deceit or other element detrimental to the individual purchaser or to the public interest. So long as the contracts had not been approved, sale of the shares was *malum prohibitum* because of the statute, and nothing more. While no decision in this Commonwealth directly in point has been called to our attention, it has been held by excellent authority in other jurisdictions that in order to sustain an indictment for conspiracy to commit an

offence which, like that here involved, is *malum prohibitum* only, belonging to a general type of offences which has been greatly extended by modern legislation in many fields, it must appear that the defendant knew of the illegal element involved in that which the combination was intended to accomplish. *People* v. *Powell,* 63 N. Y. 88. *Landen* v. *United States,* 299 Fed. Rep. 75. See *Commonwealth* v. *Adams,* 114 Mass. 323; *Vogel* v. *Brown,* 201 Mass. 261; *People* v. *Flack,* 125 N. Y. 324. We believe this is sound law, where the charge is conspiracy. We do not imply that proof of criminal intent is required to sustain a complaint or indictment for the substantive offence prohibited by the statute. To constitute the criminal intent necessary to establish a conspiracy there must be both knowledge of the existence of the law and knowledge of its actual or intended violation.

The trial judge charged the jury in accordance with these principles, but he left it for the jury to say whether all three of the defendants now before the court had a criminal intent with respect to this second indictment. We think this was error. Perhaps as to Benesch alone there was evidence of the necessary intent. He could be found to have been at the head and front of the whole enterprise. If approval of the contracts had been obtained, it could have been inferred that he would have attended to it or would have known of it and that he must have known approval had not been obtained. He contends that he had no knowledge of the act of 1924 requiring approval, but while actual knowledge cannot be predicated solely upon the maxim that every man is presumed to know the law, yet under many circumstances knowledge of important requirements of law having to do with the kind of business in which a person is engaged may be readily inferable. See *Wills* v. *Noyes,* 12 Pick. 324; *Vogel* v. *Brown,* 201 Mass. 261; *Commonwealth* v. *Brisbois,* 281 Mass. 125. It appears that Benesch at least knew that there were "Blue Sky Laws," and asked his counsel to look out for them. But one cannot be a conspirator alone. We are of opinion that the evi-

dence is insufficient to support a verdict that any of the other alleged conspirators had the knowledge, both of the existence of the prohibition and of its violation, which is necessary to prove affirmatively a criminal intent. There is no evidence that any of them knew that the contracts had not been approved or that any of them occupied such a position in the Trust that such knowledge could be inferred. It may be doubted whether there is any evidence that Davison knew even that any shares were being sold on the instalment plan. Tibbetts was a subordinate salesman taking orders from his superiors. There is nothing to show that it was his duty to see that the contracts were approved. Whether he might be found guilty, if charged with the substantive offence of making sales, is not before us. We are now concerned with actual criminal intent. Simpson was treasurer and director. He was nót a promoter, but was hired by Benesch on a salary. The duties performed by him seem to have been chiefly of a routine character. It would be carrying inferences of fact too far to assume without further evidence that he knew the law and also knew that those who had organized the Trust and put it in working order had failed to obey the law. Mr. Swift was a lawyer and was a director. He testified that he did not know of the statute of 1924 until November, 1927, and that these matters had been left to one Mr. Burns who had secured the incorporation of the Trust. There was evidence introduced by the Commonwealth that partial payment sales were stopped by September 20, 1927. If it can be inferred that Mr. Swift did know of the law, there was no evidence that he knew before November that it had not been complied with. There was no substantial evidence that partial payment sales were continued after that time. Wells and Robinson stand in much the same position. Both came into the office of the Trust long after it had been organized and was in full operation. There is at most no more than a scintilla of evidence that any of the alleged coconspirators with Benesch consciously and intentionally joined in a conspiracy to sell shares for instalments on unapproved contracts.

Other exceptions not here mentioned have become immaterial.

It follows that the exceptions of the defendants Davison and Tibbetts in the first case are sustained and the exceptions of the defendant Benesch are overruled, and that the exceptions of all three defendants in the second case are sustained.

*So ordered.*