## CRUZ et al. v. UNITED STATES.
### No. 1893.

Circuit Court of Appeals, Tenth Circuit.
Oct. 13, 1939.

M. C. Mechem, of Albuquerque, N. M. (A. T. Hannett, of Albuquerque, N. M., on the brief), for appellants.

Everett M. Grantham, U. S. Atty., and Richard E. Manson, Asst. U. S. Atty., both of Santa Fe, N. M., for the United States.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

Bernardo Cruz, Carlos Garcia, Julio Griego, Arturo Maes, Benito Paiz, Ben Gandert, and Alfonso Duran were charged by indictment with conspiracy to commit offenses against the United States, namely,

to violate the provisions of Section 12 of the Emergency Relief Appropriation Act of 1937, 50 Stat. 352, 15 U.S.C.A. §§ 721–728 note.

During the trial the indictment was dismissed as to Gandert and Duran. A motion for a directed verdict on the ground that the evidence did not establish the conspiracy charge was interposed by the remaining defendants at the close of the evidence and was denied. They were found guilty and have appealed.

The facts as disclosed by the evidence were these:

During the year 1937 a bitter interparty fight was being waged within the ranks of the Democratic party in Mora County, New Mexico. Cruz was Democratic county chairman and a dominant political factor; Garcia, Griego, Paiz, and Maes were foremen and timekeepers on WPA projects in Mora County. During the period here involved persons seeking WPA employment would make application to the Department of Public Welfare of the state of New Mexico. When found eligible for work relief, certification would be made to the state office of WPA for approval, and when approved would be sent to the Zone Assignment Office for assignment to work if available. The Zone Supervisor of Zone 4, which embraced Mora County, depended largely upon the judgment of foremen and timekeepers with respect to reduction or transfer of personnel.

Gandert, a member of the Cruz faction, was a successful candidate for county school superintendent of Mora County on the Democratic ticket at the November, 1936 election. The Republican candidate initiated a contest. In the early part of 1937 a group of Democratic politicians in Mora County held a meeting and decided to raise funds by contribution from various Democratic officeholders and others to finance Gandert's opposition to the contest. Cruz was present at this meeting. Duran was selected as treasurer to receive the donations. Shortly thereafter, Cruz contacted Griego, Paiz, Garcia, and one Ricardo Romo relative to raising funds for the contest. Cruz instructed them to collect two dollars from each worker and five dollars from each teamster on WPA projects in Mora County. They proceeded with the collection of the contributions and told many of the workers that they would lose their jobs if they did not contribute. They collected $170 from WPA workers and turned it over to Cruz with a list of the contributors. One teamster refused to make a contribution. Griego and Garcia told him he had better pay or he would lose his job. Cruz told him he should pay to show his good faith as a Democrat. Shortly thereafter, he was reduced from teamster to a common laborer. The reason given by the Zone Supervisor therefor was that the supervisory foremen had reported that he was too contrary. Griego and Garcia told him that his team was not satisfactory.

In January, 1937, a caucus for the purpose of selecting a candidate for justice of the peace was held in Mora County. Leandro Branch, a brother-in-law of Cruz, was a candidate opposing Vincente Romero. Cruz threatened WPA workers with loss of their jobs if they failed to support Branch. Julia Lucero, an employee on a sewing project, refused to support Branch and shortly thereafter was discharged. At an election held in 1937, certain proposed amendments to the New Mexico constitution were submitted to the electorate. Cruz and Garcia were active in support of certain of the amendments. They approached WPA workers and threatened them with loss of their jobs if they did not support the amendments. Cruz also told a NYA supervisor to tell the members of the NYA to go home and advise their parents to support the amendments.

Section 12, supra, so far as material here reads as follows:

"Any person * * * who knowingly, by means of any fraud, force, threat, intimidation, or boycott, or discrimination on account of race, religion, or political affiliations, deprives any person of any of the benefits to which he may be entitled under such appropriation, or attempts so to do, or assists in so doing, shall be deemed guilty of a misdemeanor."

■ Counsel for appellants contend that in order to constitute a violation of Section 12, supra, the deprivation of benefits under the appropriation by means of fraud, force, threat, intimidation, or boycott must be on account of race, religion or political affiliations. To accord such a construction to Section 12 would render the conjunction "or" after the word "intimidation" wholly superfluous. Section 12 plainly defines two classes of offenses: One, deprivation of benefits by means of fraud, force, threat,

intimidation, or boycott, and the other, deprivation of benefits by means of discrimination on account of race, religion, or political affiliations. This intent is clearly indicated by the insertion of the conjunction "or" between the words "intimidation" and "boycott" and the inclusion of the second conjunctive "or" between the words "boycott" and "discrimination."

We conclude that the phrase "on account of race, religion, or political affiliations" modifies only "discrimination" and does not refer back to the previous means enumerated in the section.

Appellants further contend that the government introduced no evidence showing or tending to show that appellants or any of them had knowledge of Section 12, supra. They assert that where an act is merely mala prohibita, in order to establish a conspiracy to violate such act, it is necessary to prove that the defendants had knowledge of the existence of the act. This contention was not specifically urged at the trial below. In order to establish a criminal conspiracy, a corrupt motive or intent must be shown. There must be an evil design, a wrongful purpose. But where a conspiracy to commit a criminal offense is charged, it is not necessary to establish knowledge on the part of the defendants of the existence of the law defining the offense, even where it is merely mala prohibita. Where a corrupt motive is established such knowledge is imputed.[1]

The evidence established that payment of political contributions was coerced from WPA workers under the belief that refusal to contribute would result in loss of their jobs. From such acts the jury could properly infer a corrupt motive, an evil design, a wrongful purpose. The coercion of such contributions through threats of loss of employment is highly reprehensible. It diverts the appropriation for work relief from its intended purpose. It is closely analogous to the crime of extortion at common law. Thus to prey upon the unfortunate is shocking to the moral sensibilities. Furthermore, it not only injures the persons coerced but threatens the welfare of the body politic. To permit the use of WPA appropriations, directly or indirectly, for political purposes, or to influence votes would be a prostitution of the funds provided by Congress for the unfortunate and would strike at the foundation of our system of government. It is essential that the right of the individual to express his political views and to vote as his judgment dictates shall remain free and untrammeled. The object of the conspiracy was clearly corrupt, evil, and wrongful.

Furthermore, if there was a want of knowledge as to the existence of Section 12 on the part of the defendants, that was a fact peculiarly within their knowledge, and when the government established a prima facie case, the burden of adducing evidence to rebut the presumption of such knowledge rested on the defendants. Blumenthal v. United States, supra; Crapo v. United States, 10 Cir., 100 F.2d 996, 1001, and cases cited in note 4.

Counsel for appellants further contend that the evidence failed to establish a conspiracy. It is true there was no proof of a formal agreement, but proof of a formal agreement is not necessary. Indeed, the agreement need not be manifest by any formal words. It is sufficient to show that the minds of the parties reached a common understanding to jointly accomplish the illegal object.[2]

Conspirators do not put their agreements into writing, nor do they make public their plans. Hence, a conspiracy is rarely susceptible of proof by direct evidence and must usually be deduced from the conduct of the parties and the attending circumstances.[3]

Here, the facts proven, together with the inferences to be drawn therefrom, warranted the jury in finding a mutual un-

---

[1] Chadwick v. United States, 6 Cir., 141 F. 225, 243;

Blumenthal v. United States, 8 Cir., 88 F.2d 522, 530;

Hamburg-American Steam Packet Co. v. United States, 2 Cir., 250 F. 747, 759, certiorari denied 246 U.S. 622, 38 S.Ct. 333, 62 L.Ed. 927.

Cf. Larden v. United States, 6 Cir., 299 F. 75, 78, 79;

Commonwealth v. Benesch, 290 Mass. 125, 194 N.E. 905, 910.

[2] Telman v. United States, 10 Cir., 67 F.2d 716, 717, 718, certiorari denied 292 U.S. 650, 54 S.Ct. 860, 78 L.Ed. 1500;

Wilder v. United States, 10 Cir., 100 F.2d 177, 182.

[3] Telman v. United States, supra, 67 F.2d page 717;

Goode v. United States, 8 Cir., 58 F.2d 105, 107.

derstanding on the part of the parties to accomplish by their combined efforts the unlawful acts charged with a corrupt intent and for a wrongful purpose.

Affirmed.