**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Thomas L. THAGGARD, Sr., and Vanzie Beasley, Defendants-Appellants.**

**No. 72–2512.**

United States Court of Appeals,
Fifth Circuit.

April 16, 1973.

Rehearing and Rehearing En Banc Denied June 8, 1973.

628

J. Paul Lowery, Montgomery, Ala., for Thaggard.

Calvin M. Whitesell, Montgomery, Ala., for Beasley.

Ira DeMent, U. S. Atty., D. Broward Segrest, David B. Byrne, Jr., Asst. U. S. Attys., Montgomery, Ala., for plaintiff-appellee.

Before COLEMAN, MORGAN and RONEY, Circuit Judges.

COLEMAN, Circuit Judge:

A jury convicted Thomas L. Thaggard, Sr. and Vanzie Beasley of conspir-

acy wilfully and knowingly to directly and indirectly conduct, finance, manage, supervise, direct, and own all or part of a gambling business in violation of the laws of the State of Alabama, involving five or more persons for more than thirty days, 18 U.S.C. § 1955.

Defendants were also convicted, in the same trial, of a conspiracy to obstruct the enforcement of the criminal laws of the State of Alabama pertaining to gambling, 18 U.S.C. § 1511.

Upon these verdicts both men were sentenced to three years imprisonment for each offense to run concurrently.

Thaggard and Beasley assign fourteen reasons for the reversal of their convictions.

The judgment of the District Court is affirmed.

In June or July of 1971, Thomas L. Thaggard, Sr. asked one James R. Sadie to become a partner with him and Beasley in a gambling establishment. Thaggard stated, however, that he had heard of a recently enacted federal law against gambling and wanted to check on that law before proceeding further with the enterprise.

Prior to his appointment in that capacity the United States Attorney for that District had represented Thaggard in another prosecution, Thaggard v. United States, 5 Cir., 1965, 354 F.2d 735, cert. denied 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 1201, so Thaggard went to see his former counsel about the new "federal law". The United States Attorney told Thaggard that he could not and would not advise him as to the statute but did give him a copy of it and told him to consult some other attorney about the matter. Thaggard did so stating that there would be only three partners or owners involved in the gambling operation. This attorney told Thaggard that he obviously would be in violation of the laws of Alabama but since "less than five persons would be involved, in his opinion there would be no federal violation".

After this conference, Thaggard, Beasley, and Sadie, as the original owners, opened the gambling house in a concrete building in a remote rural area of Crenshaw County, Alabama. From July until December, 1971, the establishment operated four nights a week. Games of dice and blackjack were played; the customers were served drinks and steaks free. The actual operation of the gambling house, however, required more than three individuals. Several other persons were hired to operate the gaming tables, to prepare food, and to guard the automobiles of the patrons while they were inside the building. A busy night would see as many as fifty or sixty persons participating in the gambling.

Several local public officials were aware of the gambling but did not interfere with it.

Completely read and fairly construed, the record reveals that the defense to the indictments was that the accused knew they were violating the gambling laws of Alabama but, on the advice of counsel, had no intent to violate the federal statutes. In this context the case was tried, the defendants were convicted, and they now appeal.

Against this background we evaluate those assignments of error which, in our opinion, merit discussion.

### 1.

Because of pre-trial publicity, the trial court erred in not granting Thaggard's motions for continuance and a change of venue.

■ Thaggard insists that the publicity he received during the protracted litigation of the bank larceny offense, Thaggard v. United States, *supra,* which came to an end seven years previously, had rendered him "notorious in the community". This notoriety, coupled with the publicity given the gambling case, he says, immutably prejudiced his trial. Specifically, he refers to items which ran in the Montgomery Advertiser for

the six months immediately preceding his trial.

The first article, on December 2, 1971 named the individuals involved in the gambling house and described in detail the operations of the establishment. The next article on May 5, 1972 featured front page pictures of Ray Horn, Drue Lackey, and Thomas Thaggard, Sr. It listed the individuals named in the indictment and quoted from portions of it. On May 10, 1972 a cartoon depicting a sign advertising the gambling establishment as "Cotton's Place" appeared. The May 12, 1972 issue again named the persons charged in the indictment and stated each count under which the defendants were charged. On June 1, 1972 the paper reported that James Sadie had pleaded guilty to the charges and again named the persons in the indictment. On June 4, 1972 the paper reported the uncovering of a large sports bookmaking operation in the Montgomery area. (There apparently was no connection between this operation and the gambling house.) Several known gamblers, including Thomas L. Thaggard, Sr., were listed as participating in this betting operation. However, no mention was made of the upcoming trial of the defendants involved in the gambling at "Cotton's Place".

Upon qualifying the jury for cause, the trial judge directed all members of the venire who had read or heard anything of the case to stand for special questions. Each was individually asked if he could render a verdict upon the law and the evidence regardless of what had been heard or read. Only one responded in the negative, and was excused. A second juror was disqualified for relationship to an alleged co-conspirator. The remaining eleven of those who had heard or read of the case responded that their verdict would not be affected by what they had heard or read.

The other nineteen members of the venire had not heard or read anything about the case. Thus, the defense began its peremptory challenges with nineteen individuals who had never heard of the case and eleven who had heard of it, although with no fixed opinion as a result of what they had heard or read. The appellants were allowed ten peremptory challenges to the trial panel and one challenge as to the alternate juror. The defense exercised only six of their ten peremptory challenges.

This hardly creates a picture of one who is empaled upon pre-trial hostility or drowned in a sea of fixed opinions.

Whether a change of venue is mandated depends on whether "there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district", Fed.R.Crim.P., Rule 21.

■ A motion for a change of venue is addressed to the discretion of the trial court and in the absence of an abuse of that discretion, the trial decision will not be overturned on appeal. United States v. Nix, 5 Cir., 1972, 465 F.2d 90.

2.

18 U.S.C. § 1955 is an unconstitutional regulation of intrastate activities and is in violation of the Tenth Amendment to the Constitution.

■ The contention of the appellants in this regard is rejected on the authority of United States v. Harris, 5 Cir., 1972, 460 F.2d 1041. We hold the statute to be constitutional on its face and there was no unconstitutionality in its application. Out-of-state cars were seen in the gambling house parking lot, poker chips from Las Vegas were used, and interstate telephone calls were made from the gambling house.

3.

■ 18 U.S.C. §§ 1955 and 1511 are unconstitutional in that they exempt activities conducted by a charitable or religious organization.

"The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same", Tigner v. Texas,

310 U.S. 141, 147, 60 S.Ct, 882, 84 L.Ed. 1124 (1940). The l\tive history of 18 U.S.C. § 1955 i\tes that Congress was concerned wi\*ganized crime*, hence Congress ha\bscribed the gambling activities on \1 it believes organized crime of a\1erstate character thrives and has exc\1 those situations in which organi crime rarely appears. Accordingly, \*e was a rational basis for excluding \itable and religious organizations \1 the purview of these statutes.

### 4.

### The Government failed prope\1o introduce and prove a violation of Alabama law.

We reject this argument \1use our examination of the record \1als that the specific statutes of the St of Alabama prohibiting the operati\of gambling houses were entered as a\x-hibit in the case. Moreover, the \ry was instructed that a violation of \1-bama law must first be found befo\1a conviction could be had. There \s really no effort to deny or controver\1 violation of the Alabama gambling la\1 The argument was that there had be no intent to violate the federal statut From our reading of the record it woul have been impossible for the jury t\1 have been in any way misled on thi\s point.

### 5.

### The trial court erroneously instructed the jury on the law as to advice of counsel and specific intent.

Appellants contend that the Government was required to prove specific intent to violate federal law, not just specific intent to commit the overt acts. They therefore object to the trial court's definition of specific intent as stated in the instructions. Their defense is that they sought advice of counsel before entering into the gambling operation.

The trial court gave the following instruction on specific intent:

"Well, you have heard a lot about intent, and you heard me talk to you a few minutes ago that it was a case of specific intent. The offenses charged in this indictment are offenses which require proof of specific intent on the part of each defendant before a defendant can be convicted, can be found guilty. What does specific intent mean? Specific intent means more than a general intent to commit an act or acts. To establish specific intent, the Government must prove beyond a reasonable doubt, as to a defendant before that defendant can be convicted, that that defendant knowingly did an act which the law forbids purposely intending to violate the law. Such intent may be determined from all of the facts and circumstances surrounding the case as reflected by the evidence. It is not necessary that the Government prove, in order to convict a defendant, that a defendant knew each of the elements involved in the substantive statute or each of the elements involved in the statute that the indictment says the conspiracy was formed to violate in count one. It is sufficient that the conspiracy agreement, if any exists, contemplated the commission of a crime and that the crime contemplated is in fact in law a federal crime. The defendants must have specifically intended to commit each act or each of the acts that make up the offenses charged. As a general rule, it is no defense to a criminal prosecution that a defendant acted in good faith relying on the advice of counsel; however, advice of counsel may be shown where it tends to prove or disprove an intent to violate the law. Advice of counsel is not a defense—is not a defense—where it's offered to tend to disprove that the defendant or defendants intended to violate the federal law; however, advice of counsel may be shown and considered by you jurors where it tends to disprove the intent to commit one or more of the acts involved. There must be a specific intent to commit each of the acts required in order to convict. The Government is not re-

quired to show that there must be a specific intent to violate a federal law, but the Government must prove that there was a specific intent to commit each of the acts necessary to prove a violation of the federal law."

The statutes here in question do not condition guilt upon knowledge that a federal law has been violated. It is sufficient that appellants intended to do all of the acts prohibited by the statute and proceeded to do them, Cruz v. United States, 10 Cir., 1939, 106 F.2d 828.

Advice of counsel, when given on full disclosure of all the facts and followed in good faith, may be a matter to be considered by the jury in determining the appellants' guilt, Shushan v. United States, 5 Cir., 1941, 117 F.2d 110, cert. denied 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531. But where defendants know that their conduct is violative of state law, their wrongful purpose *ab initio*, established beyond a reasonable doubt, leaves them in no position to claim that they had no intention of violating a federal statute which, in fact, denounced the unlawful conduct as also constituting a federal crime. Defendants may have misunderstood the full reach of the federal statute but they deliberately took that risk when they set out upon a calculated violation of the laws of Alabama. The instructions gave them all, and possibly more than, they were entitled to receive under the facts of this case.

6.

The trial court erred in allowing questions and answers pertaining to a remark made by Thaggard to witness Ben Allen Grooms.

Ben Allen Grooms was employed by the Alabama Bureau of Investigation, a private agency, as a security guard at the gambling establishment. Grooms testified as a witness for the prosecution. During Grooms' testimony, the prosecutor, referring to an overt act charged in Count II of the indictment, asked if Thaggard had ever stated what it cost to operate the place. Grooms answered that when he had expressed a concern about the place being raided, Thaggard replied that he need not worry since he was "paying three hundred dollars a night to open the doors". Thaggard contends that the remark was prejudicial and should not have been allowed. We disagree. This was one of the overt acts charged in the indictment, United States v. McGann, 5 Cir., 1970, 431 F.2d 1104. The statement was admissible against all the co-conspirators since the statement of one conspirator made in furtherance of a going conspiracy admissible in evidence against a co-conspirator, United States v. Nall, 5 Cir., 1971, 437 F.2d 1177.

7.

The trial court erred in not granting Thaggard's motion for mistrial after the prejudicial comment by the United States Attorney.

The United States called as its only rebuttal witness the United States Attorney who had formerly represented Thaggard but who had not participated in the trial of the instant case because he had been subpoenaed (but not called) as a witness for the defense. This official came to the courtroom from time to time but did not see any substantial portion of the trial.

On direct examination Mr. DeMent was asked why he, as United States Attorney, chose not to prosecute certain other participants or conspirators in the illegal operation. On cross-examination one of the defense attorneys further inquired into the subject. On redirect the Government asked if there were other reasons or factors involved in choosing not to prosecute those particular defendants. At that point the following testimony occurred:

"A    All right; as to Sheriff Horn, Sheriff Horn has been the Sheriff of Crenshaw County for over twenty years. He's been in law enforcement for thirty-four years. He is sixty-three years

old and in ill health. He has resigned in disgrace. It would serve, in my judgment, and I might add in your and Mr. Byrne's judgment, no useful purpose to prosecute and convict a man who has served his state for over twenty years and in law enforcement for over thirty-four years and is sixty-three years old and in ill health. When he comes to you through his lawyers and says, 'I will resign immediately', and he has two and a half years remaining on his term and he further says, 'I will give you a statement to the effect that I will never seek public office again', and his lawyers represent that he will tell you everything he knows about the conspiracy in Crenshaw County to operate—

MR. STRAITON: We object to that, your honor.

THE COURT: Overrule it.

"A. To operate a gambling casino and when he says, 'If you need me, I'll testify'; we weighed whether we would be better off prosecuting and attempting to convict him or whether we would be better off getting an honest Sheriff in Crenshaw County appointed by the Governor, and I have spoken to Governor Jere Beasley—

MR. LOWERY: We object to that.

THE COURT: I sustain it; that is not responsive.

MR. LOWERY: We move for a mistrial.

THE COURT: That is denied."

Quite obviously, this line of testimony had no business in the trial. Neither side should have been allowed to drag it in. What the United States Attorney did about the prosecution of other defendants or conspirators in this case, and his motives for it, was solely within his discretion, certainly insofar as these or other defendants were concerned, United States v. Cox, 5 Cir., 1965, 342 F.2d 167, cert. denied 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700. Nevertheless, the testimony of the United States Attorney merely stated his reasons for not prosecuting the county sheriff. It contained no remarks directed toward the guilt or innocence of the defendants at the bar. Indeed, Mr. DeMent could have personally known nothing about that, except that he knew of Thaggard's visit to his office which admittedly took place before the alleged criminal activities began. There is nothing in this skirmish which would justify a reversal.

8.

The trial court erred in not granting Thaggard's motion for mistrial after the prejudicial comment by the Alabama District Attorney.

Alabama District Attorney Jesse Oliver Bryan was called as the closing witness for the Government. Bryan's Judicial District included Crenshaw County. During direct testimony, he related the following telephone conversation with Billy King, County Solicitor of Crenshaw County:

"A. On 30 November, I called Billy King in the afternoon and said, 'Billy, do you know anything about any illegal gambling operations going on up in northern Crenshaw County?' And Billy precisely said to me—

MR. STRAITON: Your honor, we object to this.

THE COURT: Overrule it.

"A. —'Job, I know about it'—Job is my nickname down there—'but I swear that I have never taken a penny from them; Ray Horn has.' And that sent me right up through the ceiling; I didn't believe Ray Horn would do anything like that.

MR. LOWERY: Object to comments by the witness.

THE COURT: Sustain it.

MR. LOWERY: Move the Court for a mistrial.

THE COURT: As to the reaction of the District Attorney as to what County Solicitor King said, it wasn't responsive to the question, it is excluded.

WITNESS: I am sorry; I am sorry.

THE COURT: It is excluded."

This evidentiary occurrence provides no peg upon which to hang a reversal. The objection was "to comments by the witness", the objection was sustained, and the comment was excluded. That ends the matter.

## 9.

The trial court prejudiced the jury when it admonished Thaggard's attorney.

■ During recross-examination of the United States Attorney the following colloquy occurred between Thaggard's counsel and the trial court:

"MR. LOWERY: Yes sir; your honor, we would move to exclude the testimony of Mr. DeMent as to the reasons stated for his selection of the various parties in this charge; on the grounds that it was highly prejudicial, it invaded the province of the jury as to whether—the guilt or innocence of the parties.

"THE COURT: Well, a trial is not a game, Mr. Lowery. The trial is to get the truth of the matter, and you have permeated this trial with questions and statements and testimony that a deal has been made and that some had been chosen and some hadn't been chosen. Fairness requires that he be allowed to explain it; so your motion is denied.

"MR. LOWERY: All right, sir; we move for a mistrial.

"THE COURT: That motion is denied."

Relying on the authority of United States v. Coke, 2 Cir., 1964, 339 F.2d 183; Gudger v. United States, 1963, 114 U.S.App.D.C. 263, 314 F.2d 268, United States v. Ah Kee Eng, 2 Cir., 1957, 241 F.2d 157; and United States v. Minuse, 2 Cir., 1940, 114 F.2d 36, Thaggard contends that the trial court's comment was so prejudicial as to require a reversal. But in each of these cases with the exception of *Gudger*, the appellate court reversed on the basis of *numerous* and *continuing* comments and remarks by the trial judge. And the short *per curiam* decision in *Gudger* emphasized that the trial judge's admonishment of defense counsel's impugnment of a government witness may have negated counsel's entire attack on credibility, thus invading the province of the jury. Any prejudice attributable to the court's solitary comment was cured by his charge to the jury that they were to draw no inferences from any comments he may have made during the trial, Lacaze v. United States, 5 Cir., 1968, 391 F 2d 516.

## 10.

The trial court erred in allowing the Government to question the amount of fee Thaggard's attorney received.

■ To at least one member of this panel, this is the most questionable aspect of the trial. As already stated, the defense, however poor it may have been, was that Thaggard and Beasley were relying on advice of counsel that their participation in the gambling establishment did not amount to a violation of federal law. In support of this defense, Mr. Straiton, a trial attorney for Thaggard, took the witness stand to verify the advice he had given Thaggard prior to the commencement of activities.

After his direct testimony, the following occurred on cross-examination:

BY MR. SEGREST (Assistant United States Attorney):

"Q. What is—what was your fee for this advice?

"A. I think my fee was fifty dollars, Mr. Segrest.

"Q. What is you fee. in this case?

MR. WHITESELL: We object to that.

THE COURT: I sustain it.

MR. SEGREST: Your honor, don't you think that would be admissible on bias, to show his bias in this case and as a witness.

MR. LOWERY: We will stipulate we got a fee, your honor; but we object to any discussion of the amount.

MR. SEGREST: We think the amount of it, the extent of it, would certainly affect his judgment and integrity as a witness and we would ask for permission to ask him that question.

THE COURT: All right; go ahead.

"Q. What is your fee in this case, Mr. Straiton?

MR. LOWERY: We object.

THE COURT: Overrule it; I will permit it on that theory; I think I would have to.

"A. The fee that I received from Mr. Cotton Thaggard for representing—representing him was twenty five hundred dollars.

"Q. Now, what is the total fee of your firm; you—you are part of a firm, aren't you?

"A. Yes, sir.

"Q. What—

"A. Six thousand dollars.

"Q. And is that the total fee that you are to be paid in this case?

"A. Sir?

"Q. Is that the total extent of the fee you are to be paid in this case?

"A. Well, that is the total fee; yes.

"Q. How about expenses, now; are you to be paid expenses in addition?

"A. Yes, sir."

Cross-examination as to the amount of the fee paid to counsel for services in the case *then on trial before the jury* should not have been admitted. Attorney Straiton took the stand to verify Thaggard's request for legal advice. Without objection he stated that he received a fee for the advice and it was stipulated that the trial attorneys were receiving a fee for their services. The objection was to stating the amount of the fee. The prosecutor stated that he wished to prove the amount as reflecting the possible bias and prejudice (credibility) of the attorney-witness. If the jury wished to consider Straiton's status as attorney as bearing upon his credibility, that fact had been obvious from the beginning of the trial. That he had been paid a fee had been stipulated. Defendants have a constitutional right to counsel and attorneys are not expected to work free, even for indigents. The Criminal Justice Act provides some remuneration even for court appointed attorneys, although paid by the taxpayers. As we divine it, the real purpose for eliciting this information was to suggest that it took a big-time gambler to pay such a fee, plus the thought that Thaggard really feared a conviction and was willing to pay a "big fee" in the hope of avoiding conviction. We have no doubt that under ordinary circumstances this maneuver was both improper and prejudicial and would warrant a reversal.

Nevertheless, upon mature reflection and cool analysis we are left with an abiding conviction that the guilt of the defendants in this case was so irrefutably evident that even in an errorless trial an acquittal would have been an incredible event. Under the jurisprudence applicable to errors which are harmless beyond a reasonable doubt, we decline to reverse the convictions.

We are not unaware of the proposition that allowing prosecutors to escape reversal by the application of the harmless error rule may tempt some to wield any available stick, if the trial court permits it, hoping to get the conviction first and then to take refuge at the altar of harmless error. Prosecutors should try their cases within the rules of evidence and our decision in this case is never to be

construed as an invitation to do otherwise. We decide this case on the precept that the ends of justice do not require a reversal for this lapse; otherwise, one unhesitatingly would be ordered.

The remaining points of the fourteen originally raised do not merit discussion.

The judgment of the District Court as to both appellants is

Affirmed.