COMMONWEALTH *vs.* EDWIN NELSON, JR.
(and two companion cases[1]).

Suffolk.    September 16, 1975. — April 28, 1976.

Present: HENNESSEY, C.J., REARDON, QUIRICO, KAPLAN,
& WILKINS, JJ.

*Practice, Criminal,* Prosecutor's nondisclosure of filing of nolle prosequi, New trial. *Conspiracy. Racing.*

With respect to defendants convicted of conspiracy, it was error to deny motions for a new trial on the ground of newly discovered evidence that the prosecutor, without advising the defendants, had filed a nolle prosequi on the opening day of the trial on an indict-

---

[1] Commonwealth *vs.* William Barnoski and Commonwealth *vs.* Salvatore Macarelli.

ment against a coconspirator who on the following day was the Commonwealth's sole witness to the existence of the conspiracy and who denied on cross-examination that he had an "arrangement" with the Commonwealth. [195]

Conviction on an indictment charging that the defendant did conspire "to administer, and cause to be administered, a drug, to two horses, with the purpose of affecting the speed of such horses in . . . a race," with a bill of particulars specifying the details of the scheme, was warranted by evidence that the defendant was aware that he was a party to an unlawful agreement having such a purpose, and it was not necessary to show that he knew the details of the agreement. [195-197]

Evidence presented by the prosecution in its case in chief clearly permitted a finding that a conspiracy existed among four defendants to "fix" a horse race by drugging two horses, and to further its objective by obtaining from another conspirator cash, a part of which was for two trainers and the balance of which was to be divided among three of the four defendants. [197-201; 202-203]

There was no error in the denial of a motion for a directed verdict when the prosecution rested its case against a defendant indicted in Suffolk County for conspiracy to drug two race horses, although direct evidence that he had joined the conspiracy was lacking and all relevant evidence came from the Commonwealth's sole witness to it, where evidence sufficed to establish circumstances from which the jury could reasonably infer that the defendant knew of the existence and objective of the conspiracy to "fix" a race at Suffolk Downs on a certain date, that he became a party to the conspiracy on that date by giving cash to a coconspirator, and that the payment was made by the defendant pursuant to and in furtherance of the conspiracy. [201-203] HENNESSEY, C.J., dissenting.

INDICTMENTS found and returned in the Superior Court on January 19, 1972.

The cases were tried before *Roy, J.*

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Barbara A. H. Smith,* Assistant Attorney General (*Robert V. Greco,* Assistant Attorney General, with her) for the Commonwealth.

*Donald L. Conn* for Edwin Nelson, Jr., & *Martin K. Leppo* for William Barnoski (*James B. Krasnoo* with them).

*Anthony Bongiorno,* for Salvatore Macarelli, joined in a brief.

QUIRICO, J.   On January 19, 1972, the grand jury for Suffolk County returned separate indictments against Ed-

win Nelson, Jr., William Barnoski, Salvatore Macarelli, Anthony Ciulla, Barnum Sardonis and Robert Byrne, charging each with the crime of conspiracy to violate G. L. c. 128A, § 13B (as appearing in St. 1958, c. 86).[2] Each indictment charged that on or about April 23, 1971, the particular defendant named therein "in concert with ... [the others named above and still others to the grand jurors unknown] did conspire to administer, and cause to be administered, a drug, to two horses, with the purpose of affecting the speed of such horses in or in connection with a race conducted under the provisions of Massachusetts General Laws, Chapter 128A."[3]

The indictment against Byrne was nol prossed in circumstances hereinafter described. The other five indictments were tried together to a jury which convicted Nelson, Barnoski, Macarelli and Ciulla, and acquitted Sardonis. The defendants Nelson (indictment No. 63608), Barnoski (indictment No. 63609) and Macarelli (indictment No. 63612) obtained appellate review by the Appeals Court on their substitute joint bill of exceptions. That court ordered that the verdicts be set aside and the judgments against all three appellants be reversed, that a judgment of acquittal be entered for Nelson, and that the indictments against Barnoski and Macarelli stand for new trials thereon. *Commonwealth* v. *Nelson,* 3 Mass. App. Ct. 90 (1975).

This court thereafter allowed the Commonwealth's petition for further appellate review. The Commonwealth argues that the trial judge was correct in denying the mo-

---

[2] "No person shall administer or cause to be administered any drug, internally or externally by injection, drench or otherwise, to any horse or dog for the purpose of retarding, stimulating or in any other manner affecting the speed of such horse or dog in or in connection with a race conducted under the provisions of this chapter. Whoever violates this section shall be punished . . . ."

[3] On the indictment against Nelson the prosecution filed specifications: charging him with "assisting one or more of the other defendants in conspiring to commit the offense as set forth in the indictment and more particularly by providing monies to further the conspiracy"; identifying by name two horses in the ninth race at Suffolk Downs on April 23, 1971, run in the afternoon of that date; and identifying the drug as acetophenazine.

tions of Barnoski and Macarelli for a new trial and in denying Nelson's motion for a directed verdict. As to the defendants Barnoski and Macarelli we reach the same result as the Appeals Court and on the same reasoning. As to the defendant Nelson we hold that the trial judge properly denied his motion for a directed verdict, but that he too is entitled to a new trial on the same reasoning applied to the defendants Barnoski and Macarelli.

1. We consider first the contentions of Barnoski and Macarelli that it was error for the trial judge to deny their motions for a new trial on the ground of newly discovered evidence that the prosecutor, without advising the defendants thereof, had filed a nolle prosequi of the indictment against Byrne on the opening day of the trial, which was the day before Byrne took the stand as the Commonwealth's sole witness to the existence of a conspiracy. On cross-examination by defense counsel, Byrne in substance denied that he had any "arrangement" with the Commonwealth. The assistant attorney general listened in silence while Byrne gave this testimony.

The Appeals Court determined that Barnoski and Macarelli were entitled to a new trial because of the prosecutor's failure to disclose the nolle prosequi to the defense until after the trial. We reach the same conclusion and on the same reasoning. There is no necessity for us to recreate here the Appeals Court's full discussion of this issue.

2. Nelson moved for a directed verdict of not guilty when the prosecution rested its case against him. The judge denied the motion. The Appeals Court concluded that Nelson was entitled to a directed verdict and that a judgment of acquittal should be entered in his favor. We cannot concur in the reasoning by which the court reached that result. We conclude instead that the judge properly denied the motion.

The Appeals Court reasoned in substance that, because the Commonwealth had specified the details of the alleged conspiracy, it had to prove that Nelson was aware of the details. That court said (at 95-96): "The sufficiency of the foregoing evidence to warrant a conviction of Nelson

must be determined in the light of the principle that one cannot be found guilty of a conspiracy in the absence of a showing that he was aware of the objective of the conspiracy which has been charged.... [Citations omitted.] The conspiracy Nelson was charged with by the indictment and the specifications ... was not a general one to influence the outcome of a horse race by one or more of the unlawful means enumerated in G. L. c. 128A, §§ 13B (n.2) and 13C (as inserted by St. 1950, c. 111), or by some other unlawful means.... [Citations omitted.] The conspiracy charged and specified was extremely narrow, one 'to administer, and cause to be administered, a drug, to two horses, with the purpose of affecting the speed of such horses in or in connection with a race ....' § 13B. That was the conspiracy laid at Nelson's door and the one the Commonwealth was obliged to prove he was aware of before it would be entitled to a conviction."

We agree that it must be shown that the defendant was aware of the objective of the conspiracy which was alleged. However, in our view, this does not mean that it must be shown that Nelson knew all specifics of the unlawful agreement. "The part each is to play, the reward or satisfaction to be received by each, and *the knowledge possessed by each of the scope and details of the affair may be widely at variance*" (emphasis supplied). *Attorney Gen.* v. *Tufts*, 239 Mass. 458, 493 (1921). *Commonwealth* v. *Kiernan*, 348 Mass. 29, 55-56 (1964), cert. denied sub nom. *Gordon* v. *Massachusetts*, 380 U.S. 913 (1965). *Blumenthal* v. *United States*, 332 U.S. 539, 556-557 (1947). It was sufficient for the Commonwealth to show here that Nelson was aware that he was a party to an unlawful agreement to affect the speed of a horse or horses in order to affect the outcome of a horse race. See G. L. c. 128A, § 13C. To conclude that the Commonwealth must show more than this would be tantamount to saying that a person who joined a conspiracy to "fix" a horse race, but who limited his participation to supplying the funds to be used in the scheme, and who scrupulously avoided acquiring knowledge of the method and means by which his coconspirators planned to alter the

outcome of the race, could not be found guilty of conspiracy. In our view such a proposition is not in accordance with the existing law.

It is not crucial that the Commonwealth spelled out the details of the scheme in its particulars. As a consequence of the particulars, the Commonwealth was required to prove that there was an agreement as specified, but it was not required to show Nelson's total knowledge of the details.

3. We turn now to the question whether the evidence before the jury when Nelson filed his motion for a directed verdict, considered in its light most favorable to the Commonwealth, was sufficient to permit the jury to find or infer the facts which the Commonwealth was required to prove as we have defined that burden above. We hold that it was. We summarize the relevant evidence, all of which came from the testimony of Byrne, who was called by the prosecution as its only witness to the existence of a conspiracy.[4]

At some time between 9 A.M. and 9:30 A.M. on April 23, 1971, Barnoski, whom Byrne had known for about eight years, called on the latter in his apartment in Somerville with the advice, "We've got a play going today," and an inquiry as to whether "you want to make some money?" Byrne responded in the affirmative, dressed, and proceeded by cab (paid for by Barnoski) to Barnoski's house in Somerville. There he met Barnoski, Ciulla and Macarelli, the latter two being persons he had also known for several years. Ciulla made telephone calls while Byrne perused a racing sheet on which someone (probably Ciulla) had crossed out the names of certain horses scheduled to run that day in the ninth race at Suffolk Downs.

Barnoski, in the presence of Ciulla and Macarelli, asked Byrne if he knew how to get to Brockton, and Macarelli wrote down specific instructions for getting there. Either Ciulla or Macarelli said to Barnoski, "We'd better get on the phone with Nelson and tell him he is on his way."

---

[4] We adopt here the summary of the facts as included in the opinion of the Appeals Court; no party raises any question as to the correctness or fairness of this account.

Barnoski told Byrne "to go down and speak to no one but Nelson, and pick up an envelope with $1,000 in it, open the envelope in front of Nelson, count the money in front of him, and not to answer any questions he might ask me, just to say, if he asked me any questions, 'Billy [Barnoski] will be in touch with you,' and not to offer any information whatsoever." Byrne was told to come right back from Brockton as fast as possible. There was "[no] talk on that occasion as to what was proposed to be done with respect to the ninth race at Suffolk." Byrne left for Brockton in Ciulla's car, taking with him the latter's gasoline credit card. As he left, Barnoski "was talking to someone on the phone, describing me, what I had on; and that I was leaving, on my way."

Byrne drove to Nelson's law office in Brockton, where, according to his testimony, the following transpired with Nelson: "He came into the room, a man came into the room, and he said, 'Are you Bobby?' And I said, 'Yes, Billy sent me.' I said, 'Are you Eddie?' And he said 'Yes.' I said, 'I'm supposed to get an envelope off you.' He then proceeded — to put his hand in his pocket, pulled out a roll of money, and he counted out ten one hundred dollar bills. He then asked me, he says, 'Are you supposed to give me the name of the horses?' And I says, 'No.' I said, 'They'll inform you about it later.' I says, 'Someone will call you.' He says, 'Well, have Billy call me as soon as you get back so I can get down in plenty of time.' And I says, 'Okay.' I says, 'I'm just here to pick up the money.' I then asked him the best way to get back onto the Expressway, and he told me . . . [a]nd I left . . ."

Byrne returned to Barnoski's home, where Barnoski, Ciulla and Macarelli were present and where Byrne handed Ciulla the money he said he had obtained from Nelson. Ciulla counted the money, returned $800 to Byrne, and kept two $100 bills which he, Barnoski and Macarelli thereupon attempted to divide among themselves. Barnoski then instructed Byrne that he was to proceed to a diner outside the main entrance to Suffolk Downs, where he was to await the arrival of Sardonis, who was the owner of one of the

horses identified in the Commonwealth's specifications (see n.3). Sardonis, according to Barnoski, was to take Byrne inside the track "to his horse to get at [it]," and then Byrne was to go to another shed to meet the trainer of the other horse identified in the specifications. "And I was to give each of these individuals $400 apiece, and I was to make sure that — they were to take me into the stall, and I was to see with my own eyes them putting the drug into the horse myself. If I didn't do it, they were to do it, but I was to see that it went into the horse, the syringe was emptied, or I wasn't to give him the $400 . . . ."

Byrne then secured from a bag in the trunk of Ciulla's car (where he said he had previously placed them) two bottles of a yellowish fluid resembling castor oil which he called "ace pronazine,"[5] and from eight to twelve syringes. Macarelli, in the presence of the other three, filled two of the syringes from one (or both) of the bottles and gave the syringes to Byrne. Macarelli drove with Byrne to Suffolk Downs in Ciulla's car, but they were unable to find Sardonis. They called Ciulla by telephone to report their inability to find Sardonis. Ciulla instructed Byrne to jump the fence to get into the stable area of Suffolk Downs, to proceed to the stable of the trainer other than Sardonis and whose horse was one of the two to be drugged, and that the other trainer would tell him how to get to the Sardonis stable. Instead of jumping the fence to the stable area, Byrne attempted to enter through a gate not open to the public at a time when, the jury could have found, the ninth race was yet to be run. He was stopped for questioning by a track security man, who became suspicious and summoned a Revere police officer. The officer observed the syringes protruding from Byrne's jacket and arrested and searched him. The search yielded the syringes, $800, and Ciulla's credit card. Byrne was booked on a charge of unlawful possession of a syringe. He immediately secured his release on bail, using a portion of the $800 for that purpose.

---

[5] Determined on subsequent chemical analysis to be acetophenazine, a drug which, when injected into a horse, will retard it in a race.

Commonwealth *v*. Nelson.

On the following day the officer secured a complaint against Byrne from the District Court of Chelsea on the charge for which he had been booked.

The evidence presented by the prosecution in its case in chief, if believed by the jury, was clearly sufficient to permit a finding of the existence of a conspiracy between Barnoski, Macarelli, Ciulla and Byrne to "fix" the ninth race at Suffolk Downs on April 23, 1971, by drugging two horses entered in that race, and to obtain from Nelson $1,000 in cash from which $400 was to be paid to the trainer of each of the two horses to be drugged and the balance of $200 was to be divided among Barnoski, Macarelli and Ciulla. The evidence was also sufficient to permit a finding that these four conspirators committed many overt acts in their attempt to achieve the objective of the conspiracy, viz., the drugging of the horses, but that they were thwarted by the arrest of Byrne before he could reach the horses. The overt acts included the obtaining of the $1,000 in cash from Nelson by Byrne and the trip by Byrne to Suffolk Downs with $800 of that money to be used in paying off the trainers of the two horses to be drugged.

The critical question with reference to Nelson, in view of the fact that the prosecution's case in chief included no direct evidence that he joined the conspiracy, is whether the evidence presented was sufficient to permit the jury to infer that he knew of the existence and objective of the conspiracy and that he became a party to it. *Commonwealth* v. *Kelley*, 359 Mass. 77, 91 (1971). We hold that it was.

The law of this Commonwealth does not limit the manner of proving the crime of conspiracy to direct evidence of an accused's participation in the conspiracy or to his admission of such participation. Nor does it preclude proof of this crime by circumstantial evidence. This court has many times stated and applied the following rule to such cases: "A conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of

different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object, especially if by the same means or in the same manner, may be satisfactory proof of a conspiracy." *Commonwealth* v. *Smith,* 163 Mass. 411, 417-418 (1895). *Commonwealth* v. *Beneficial Fin. Co.,* 360 Mass. 188, 251 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts,* 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts,* 407 U.S. 914 (1972). *Commonwealth* v. *Beal,* 314 Mass. 210, 221 (1943). *Attorney Gen.* v. *Tufts,* 239 Mass. 458, 494 (1921). In *Commonwealth* v. *Schnackenberg,* 356 Mass. 65, 74 (1969), we said that "[c]ircumstances must be shown from which a reasonable inference can be drawn that the defendant participated in the particular conspiracy charged."

In *Commonwealth* v. *Ehrlich,* 308 Mass. 498, 500 (1941), we said: "A jury may find a crime proved beyond a reasonable doubt even though the inference of guilt from the facts established is not inescapable or necessary. There is a case for the jury unless the inference either is forbidden by some special rule of law or is unwarranted because too remote according to the ordinary course of events. If there is a case for the jury, they are at liberty to use their general knowledge in determining what inferences are established beyond a reasonable doubt, and the facts inferred by them are as properly proved as if directly testified to." Substantially the same language has been used in many other decisions of this court. *Commonwealth* v. *Schnackenberg,* 356 Mass. 65, 73 (1969). *Commonwealth* v. *Bonomi,* 335 Mass. 327, 355-356 (1957). *Commonwealth* v. *O'Brien,* 305 Mass. 393, 401 (1940). *Commonwealth* v. *Doherty,* 137 Mass. 245, 247 (1884).

While the alleged error by the judge in denying Nelson's motion for a directed verdict must be considered on the basis of all of the evidence which had been introduced to that point in the trial, it may be helpful at this point to identify that area of the evidence which is of greatest significance with reference to Nelson. That includes the evidence of the conversations at Barnoski's house just before

Byrne left to go to Nelson's law office in Brockton, the conversation by Barnoski on the telephone with someone, apparently Nelson, describing Byrne's clothing and appearance, and the events and conversation which took place when Byrne and Nelson met at Brockton. That was the occasion when Nelson gave Byrne $1,000 in ten bills of $100 each and asked Byrne whether he was to receive the names of horses and was told by Byrne that Barnoski would inform him about that later. Nelson then said: "Well, have Billy [Barnoski] call me as soon as you get back *so I can get down in plenty of time*" (emphasis supplied).

The operation of horse race tracks and dog race tracks with pari-mutuel betting on the results of the races has been lawful in this Commonwealth since the enactment of G. L. c. 128A by St. 1934, c. 374, § 3. We take judicial notice of the fact that the Suffolk Downs horse race track and a dog race track have operated in Suffolk County since shortly after it became lawful to do so, and that a number of other horse and dog race tracks have operated within a fifty-mile radius of Suffolk County for many years. We therefore believe that the Suffolk County jurors who decided this case had a sufficient exposure to the language in common use with the placing of bets on horse races, and not necessarily limited to the placing of bets at the tracks, to understand and infer that Nelson's statement "so I can get down in plenty of time" meant the same as though he had said "so I can place a bet" or "so I can get a bet down" in plenty of time before the race in question.

We conclude that the evidence presented by the prosecution in its case in chief, when considered in its entirety and in its light most favorable to the Commonwealth, was sufficient to establish circumstances from which the jury, without resort to conjecture or surmise, could reasonably infer that Nelson knew of the existence and objective of the conspiracy to "fix" a race at Suffolk Downs on April 23, 1971, that he became a party to the conspiracy no later than the time on that day when he gave Byrne $1,000 in cash, and that the payment was made by him pursuant

to and in furtherance of the conspiracy. The fact that the evidence did not require the jury to draw the inference that Nelson knew of and joined the conspiracy does not preclude the conclusion we have reached. It is sufficient that the evidence permitted the inference which the jury obviously drew against Nelson. *Commonwealth* v. *Kelley*, 359 Mass. 77, 94 (1971).

While we have limited our consideration of the denial of Nelson's motion for a directed verdict to the evidence which had been introduced up to the time he filed his motion, there was ultimately additional evidence relating to him which the jury had before them when they arrived at their verdict that he was guilty. Some of that additional evidence is summarized in the opinion of the Appeals Court in *Commonwealth* v. *Nelson*, 3 Mass. App. Ct. 90, 95 (1975), and it is not necessary to repeat it here.

Despite our holding that the judge properly denied Nelson's motion for a directed verdict of not guilty, we hold further that Nelson is entitled to a new trial. He is entitled to a new trial because he too was prejudiced by the delayed disclosure of the entry of the nolle prosequi against Byrne which is the basis for our holding that Barnoski and Macarelli are entitled to a new trial.

4. In summary we hold and order as follows: (a) the judgments on indictment No. 63608 against Nelson, indictment No. 63609 against Barnoski and indictment No. 63612 against Macarelli are reversed, and the verdicts thereon are set aside, and (b) the three indictments are to stand for a new trial or trials thereon.

*So ordered.*

HENNESSEY, C.J. (dissenting in part). I join in that much of the majority opinion which reverses the judgments on the indictments against the defendants Nelson, Macarelli and Barnoski, sets aside the verdicts and orders a new trial or trials for the defendants on the indictments.

I dissent, however, from the majority's holding that the trial judge properly denied the defendant Nelson's motion for a directed verdict of not guilty.[1] I would order that a judgment of not guilty be entered for the defendant Nelson.

The majority correctly concludes that the Commonwealth presented sufficient evidence which, if believed, warranted the jury in finding that there was a conspiracy between Barnoski, Macarelli, Ciulla and Byrne to "fix" the ninth race at Suffolk Downs on the date in question, and to obtain $1,000 in cash from Nelson to further the objective of the conspiracy. I concede further that the Commonwealth presented, and the trial judge properly admitted, evidence which linked Nelson to the conspirators in this case: the comment by either Ciulla or Macarelli to Barnoski to the effect that Nelson should be notified that Byrne was "on his way"; Barnoski's instructions to Byrne "to go down [to Brockton] and speak to no one but Nelson, and pick up an envelope with $1,000 in it ... and not to answer any questions [Nelson] might ask ... just to say, if [Nelson] asked ... any questions, 'Billy [Barnoski] will be in touch with you,' and not to offer any information whatsoever"; the fact that, as Byrne was leaving for Brockton, he heard Barnoski "talking to someone on the phone," describing him (Byrne) and his attire, and telling that someone that he (Byrne) was on his way; the confrontation and conversation between Nelson and Byrne in Nelson's office in Brockton where Nelson gave Byrne ten $100 bills and said, "Are you supposed to give me the name of the horses?" and "Well, have [Barnoski] call me as soon as you get back so I can get down in plenty of time"; and, that two calls had been made from Barnoski's telephone to Nelson's telephone, the first at a time consistent with Byrne's return to Barnoski's house, the second at a time

---

[1] I need not and do not take issue with the majority's disagreement with the reasoning of the Appeals Court with regard to the Commonwealth's burden of proving Nelson's awareness of the details of the conspiracy as specified in the bill of particulars. See *United States* v. *Feola,* 420 U.S. 671, 692 (1975); *Blumenthal* v. *United States,* 332 U.S. 539, 557 (1947).

following Byrne's arrest at Suffolk Downs, which may have been witnessed by Macarelli.

From all this evidence, the jury could infer that Nelson provided the money which later was used by others in furtherance of the scheme; that Nelson talked by telephone (perhaps twice) to Barnoski, who knew all the details of the scheme, and that Nelson later gave the money to a man he knew to be Barnoski's messenger; that Nelson inquired about Barnoski's informing him of the names of "horses," and wanted the names so he could "get down in plenty of time"; and that Nelson or someone in Nelson's office received a telephone call from Barnoski at a time after the arrest of Byrne.

I part company with the majority at this point, however, because, in my view, this evidence, even when viewed in its aspect most favorable to the Commonwealth, was not sufficient to support the inference that Nelson had the requisite guilty knowledge. The test is whether the inference was warranted beyond a reasonable doubt. Probability is not enough; "seriously suspicious" evidence is not enough. *Commonwealth* v. *David*, 335 Mass. 686, 696 (1957). The evidence must be sufficient to reach the level of moral certainty (*Commonwealth* v. *Russ*, 232 Mass. 58, 68 [1919]; *Commonwealth* v. *Webster*, 5 Cush. 295, 319-320 [1850]; see Comment, 24 U. Chi. L. Rev. 561 [1957]), even in cases where common experience may tempt a court to accept a lesser level of proof which may be dispositive in extra-legal contexts.

The majority opinion, quite rightly I believe, points out that because secrecy and concealment are essential features of successful conspiracies (*Commonwealth* v. *Kiernan*, 348 Mass. 29, 55-56 [1964], cert. denied sub nom. *Gordon* v. *Massachusetts*, 380 U.S. 913 [1965]), proof of the crime must, often and necessarily, be circumstantial in nature. A jury case is made out unless the inference of guilt is "forbidden by some special rule of law, or is declared unwarranted because too remote, according to the ordinary course of events." *Commonwealth* v. *Bonomi*, 335 Mass. 327, 356 (1957). *Commonwealth* v. *Doherty*, 137 Mass.

245, 247 (1884). On the state of the proof in this case, however, other principles, not alluded to by the majority, are equally relevant and persuasive. "[I]f, upon all the evidence, the question of guilt of the defendant is left to conjecture or surmise and has no solid foundation in established facts, a verdict of guilty cannot stand." *Commonwealth* v. *Fancy,* 349 Mass. 196, 200 (1965), quoting from *Commonwealth* v. *O'Brien,* 305 Mass. 393, 401 (1940). See *Commonwealth* v. *Kelley,* 359 Mass. 77, 88 (1971). Furthermore, "[w]hen the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof." *Commonwealth* v. *Fancy, supra,* citing *Commonwealth* v. *Smith,* 342 Mass. 180, 183 (1961), and *Commonwealth* v. *Carter,* 306 Mass. 141, 147 (1940). *Commonwealth* v. *O'Brien, supra.*

Thus, in my view, it is at least as reasonable to infer (a) that Nelson provided money and sought the names of horses for a purpose (in so far as he knew) unrelated to the "fixing" of a race as it is (b) to infer that he was involved in the unlawful scheme to fix the race. The possibilities of an innocent purpose are many, but those which most readily come to mind center around the use of the money and the names of the horses in connection with wagering and "tips."[2] These many possibilities, which admittedly should be considered in light of the jury's undoubted privilege to infer that Nelson's providing the money and uttering the words "so I can get down in plenty of time" meant that Nelson wanted the names of certain horses so he could "get a bet down," must be weighed along with, in particular, *Byrne's testimony that he had been instructed to refuse to answer Nelson's questions or to provide Nelson with any information.*[3] Further, I cannot

---

[2] Even if the contemplated wagering was unlawful, it would not be material as proof of the indictment here which charged conspiracy to fix a race.

[3] It is not appropriate in this context to consider Byrne's testimony in fragmented fashion. Thus the exculpatory nature of this portion of his testimony is significant in supporting my conclusion that the case against Nelson should fail, as no more than conjectural.

even begin to speculate as to the possible pretexts or representations which may have been made by the other men to Nelson.[4] All of this is considered in the light that there was no evidence of prior unlawful dealings or agreements between Nelson and the others.

I have considered this case with relation to other cases in which this court concluded that the proof was not sufficient to warrant a conclusion that the defendant was a participant in a conspiracy as charged.

In *Commonwealth* v. *David,. supra* at 695-696, we held that a verdict of not guilty should have been directed for one defendant (Young) because the evidence, though "seriously suspicious," was insufficient to "reach the point of providing the proof which would warrant a verdict of guilty." The evidence showed that Young sold 20,000 gelatin capsules (peculiarly suitable for use in distributing heroin) to the persons who planned to distribute the drug; that he participated in removing the labels from the boxes containing the capsules for the purpose of concealing the source of the materials; that he knew two of the three men implicated in the scheme to distribute heroin; and that he lied to narcotics agents and the police about certain facts when interrogated. Nevertheless, we said: "Assuming that a conviction would be warranted by evidence of the sale of the capsules by Young with actual knowledge of the conspiracy, we think that here the jury would not be warranted in finding that such knowledge had been proved beyond a reasonable doubt." *Id.* at 695.

In *Commonwealth* v. *Benesch,* 290 Mass. 125, 129-132 (1935), we held that a defendant (Davison) was not shown to be a conspirator in an unlawful plan to defraud purchasers of investment trust shares by false representations as to the purchase of underlying securities, although it was shown that his relationship to the investment trust was extensive; that he was aware at one time of wrongful

---

[4] It is not inconsistent with this premise that Nelson's defense was of an alibi nature, and that he denied any knowledge of the encounter described by Byrne; Nelson's right to the directed verdict accrued before he himself testified. *Commonwealth* v. *Kelley, ante,* 147, 150 n.1 (1976).

Commonwealth *v.* Nelson.

manipulation of some of the shares; and that he was on the payroll of the trust and from time to time drew large sums of cash from its accounts for his own benefit. We said: "Whatever inferences might be drawn with reference to Davidson's connection with the Trust, there is nothing in the evidence to support a finding that he knowingly and intentionally joined ... in a conspiracy ...." *Id.* at 131.

Similarly, in *Commonwealth* v. *Anthony*, 306 Mass. 470, 479-481 (1940), it was held that where a series of larcenies occurred from customers' accounts held by a stockbroker partnership, it could properly be inferred that the partner who was the "inside man" of the firm participated in the crimes, but it could not properly be inferred that the second partner (Anthony), who was the "outside man," knew of, approved, participated in or was in any way involved in any conspiracy.

In *Commonwealth* v. *O'Rourke*, 311 Mass. 213, 220-221 (1942), we held, in a case alleging conspiracy to make and use false nomination papers for elective office, that the defendant (O'Rourke), who was daily involved with the handling and delivering of the papers, was not shown to be a member of the conspiracy, although the inference of guilt was warranted against the other defendants solely on circumstantial evidence, including the appearance of the papers. See *Commonwealth* v. *Chagnon*, 330 Mass. 278, 282-283 (1953); *Commonwealth* v. *Lopes*, 318 Mass. 453, 455 (1945).

In summary, I think that the jury would not be warranted in finding beyond a reasonable doubt that Nelson was a coconspirator. His conduct was highly suspicious. Nevertheless, in my opinion, the evidence against him "does not bridge the gap between suspicion and proof" (*Commonwealth* v. *O'Rourke, supra* at 220), and did not warrant his conviction.